727 F.2d 202
 14 Fed. R. Evid. Serv. 1522
 Jane S. SHATKIN, as Executrix of the Estate of Lloyd J.
Shatkin, Deceased, Plaintiff-Appellee-Cross-Appellant,
v.
McDONNELL DOUGLAS CORPORATION and American Airlines, Inc.,
Defendants-Appellants-Cross-Appellees.
 Nos. 288, 396 and 520, Dockets 83-7674, 83-7680 and 83-7698.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 23, 1983.
Decided Jan. 26, 1984.
 
 Randal R. Craft, Jr., New York City (Peter Hoenig, Lawrence M. Harnett, Haight, Gardner, Poor & Havens, New York City, of counsel), for defendant-appellant American Airlines, Inc.
 Mendes & Mount, New York City (Garrett J. Fitzpatrick, Anthony G. Bouscaren, New York City, of counsel), for defendant-appellant McDonnell Douglas Corp.
 David S. Gould, New York City (F. Lee Bailey and Aaron J. Broder, New York City, of counsel), for plaintiff-appellee Jane S. Shatkin.
 Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Defendants American Airlines, Inc. (American) and McDonnell Douglas Corporation (McDonnell Douglas) appeal from that portion of a judgment entered in the Southern District of New York pursuant to the order of Judge Milton Pollack after a jury rendered a special verdict awarding plaintiff Jane Shatkin $87,500 for conscious pain and suffering experienced by her son Lloyd Shatkin immediately prior to the crash of an American Airlines jet on which he was a passenger. Plaintiff cross-appeals from that portion of the special verdict that awarded her $15,000 for loss of services and $15,000 for loss of financial support. We reverse the award for pre-impact pain and suffering and remand with instructions to enter judgment for the defendants notwithstanding the verdict. We affirm the awards for loss of services and financial support.
 
 
 2
 This case stems from the highly publicized crash of a DC-10 plane on an American Airlines flight near O'Hare International Airport on May 25, 1979, after it lost an engine during take-off. All of those aboard the plane, including Lloyd Shatkin and his wife, Ina, were killed immediately upon impact. Mr. and Mrs. Shatkin left mutual wills bequeathing their property in the event of their simultaneous deaths to their respective parents. Lloyd's will left three-quarters of his estate to his mother, Jane S. Shatkin, and one quarter to his wife's parents. His mother was appointed executrix of his estate and as such brought this action against American and the jet's manufacturer, McDonnell Douglas, to recover damages for wrongful death and pre-impact pain and suffering. On June 29, 1979, the Judicial Panel on Multidistrict Litigation ordered the action transferred to the Northern District of Illinois pursuant to 28 U.S.C. Sec. 1407 for consolidated pre-trial proceedings. After conducting extensive discovery the parties entered a "no contest" stipulation as to the defendants' liability on September 10, 1982. On November 18, 1982, the action was remanded to the Southern District of New York for trial of the damages claim.
 
 
 3
 Following further discovery trial was held from June 9 through June 13, 1983. The evidence was undisputed that the plane was a wide-bodied three-engine DC-10 manufactured by defendant McDonnell Douglas Corporation and operated by defendant American Airlines on its Flight 191, which took off on May 25, 1979, from O'Hare International Airport, Chicago, Illinois. Upon take-off the plane lost an engine on its left side. Mr. Shatkin, a passenger, was seated on the right side of the plane in seat No. 24H, from which a passenger would not normally be able to note the absence of an engine on the left side. The total flight lasted 31 seconds from take-off until the crash.
 
 
 4
 Portions of a report of the National Transportation Safety Board (NTSB), which is based on data from the plane's flight recorder, reveal that the plane was able to take off smoothly despite the loss of the engine, climbing to 325 feet. The flight lifted off in a slight left wing-down attitude. This condition was corrected by application of a right wing-down aileron and right rudder, stabilizing the plane at a wings-level stance, and the plane continued to climb. At about 11 seconds before impact the plane began to roll slightly to the left. It was not until 3 seconds before impact that the plane reached a 90-degree position. It then crashed. Barbara Mueller, who witnessed the movements of the plane from a distance of 2 1/2 miles from the airport and 1 mile from the scene of the crash, testified that she saw the plane tilt from side to side and descend nose-down just before the crash. However, she did not see the take-off and had no recollection of the timing of the movements she witnessed other than to say, "It might have been seconds, minutes, I cannot really tell you." Thus there is not necessarily any inconsistency between her testimony and the flight recorder. Both indicate that the plane was not in obvious difficulty until a very short time before impact.
 
 
 5
 In view of the "no contest" stipulation with respect to liability the trial was concerned almost entirely with proof as to damages. Aside from evidence as to the plane's pre-impact movements no proof of conscious pain and suffering on the part of Lloyd Shatkin was introduced. However, plaintiff did offer some evidence in support of her claim for loss of services and financial support.
 
 
 6
 At the time of the crash Lloyd Shatkin was 29 years old and employed as a buyer for Mayfair Incorporated, a retail home furnishing firm in Albany, New York. His 1979 salary was $18,000 a year. His employer testified that his 1980 salary probably would have been $28,000 to $30,000, including bonus, but that it was impossible to estimate his future income from the company.
 
 
 7
 Plaintiff Jane S. Shatkin, a nurse, was a 66-year old widow (her husband died in 1969) with a life expectancy of 14.8 years at the time of her son's death. She had received $80,000 in life insurance payments on her husband's death and returned to work. She earned approximately $12,000 to $14,000 in 1978 and $12,000 in 1979. Prior to his death her son Lloyd had in 1969 assigned to her monthly payments of $96.01 due under an annuity inherited from his father, which expired in 1979. The son was apparently devoted to his mother, making small gifts to her from time to time, advising that she could come to live with him rather than go into a home and doing repair jobs for her around her house.
 
 
 8
 After a voir dire Judge Pollack filed an opinion (published at 565 F.Supp. 93) refusing to admit the testimony of Dr. Edmund Mantell, an economics expert called by plaintiff to testify as to his projections of Lloyd Shatkin's future gifts to Mrs. Shatkin based on assumptions as to economic trends, future tax rates, Lloyd's income and percentages of disposable income that he assumed Lloyd would probably have assigned to his mother. Objections to the evidence were sustained on the ground that "Dr. Mantell's assumptions and techniques of calculation involve egregious and gross error at almost every step," 565 F.Supp. at 94, and that "[t]hese assumptions are no more than conjecture and wild speculation." Id. at 95. Judge Pollack concluded that "[g]iven all the facts and circumstances of this case, the testimony would seriously prejudice, mislead and confuse the jury...." Id. at 96.
 
 
 9
 The jury returned special verdicts awarding $87,500 for Lloyd Shatkin's conscious pain and suffering prior to impact, $15,000 for the loss of household services that Lloyd would otherwise have performed for his mother, and $15,000 for support Lloyd would have given his mother over the course of their respective life expectancies. On June 20, American moved pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for judgment notwithstanding the verdict on the claim for pre-impact pain and suffering; in the alternative, American sought an order pursuant to Rule 59 setting aside the verdict and granting a new trial on that issue. The court denied the motion on July 5 and entered judgment on July 6, 1983, from which the defendants appeal.
 
 
 10
 On August 6, 1983, plaintiff moved for leave to file a motion for a new trial on the issues of loss of support and services, alleging that the jury's awards were inadequate. On August 12, 1983, the district court denied the motion both on the merits and because it was untimely, from which plaintiff appeals.
 
 DISCUSSION
 
 11
 Plaintiff's Claim for Pre-Impact Pain and Suffering
 
 
 12
 Defendants claim that the district court erred in not dismissing plaintiff's claim based on the deceased's alleged pre-impact pain and suffering. Relying principally on Clancy v. Port of New York Authority, 55 A.D.2d 587, 389 N.Y.S.2d 615 (1st Dept.1976), they contend that under New York law no recovery may be had on such a claim.[1] Secondly they argue that, even if damages could be recovered for pre-impact pain and suffering, the claim here was wholly unsupported by the evidence. Since we agree with the latter contention it is unnecessary to rule on the former.
 
 
 13
 Assuming that pre-impact pain and suffering is compensable, it must first be shown by a preponderance of the evidence that the decedent had some knowledge or other basis for anticipating the impending disaster; otherwise no basis would exist for a finding of fright or mental anguish. In granting summary judgment dismissing a similar claim, the court in Anderson v. Rowe, 73 A.D.2d 1030, 425 N.Y.S.2d 180 (4th Dept.1980), recognized this elementary proposition:
 
 
 14
 "The plaintiff was not able to present any evidence that they suffered any conscious pain. Nor was the plaintiff able to show evidence from which one might imply that the decedents were aware of the danger and suffered from pre-impact terror." (73 A.D.2d at 1030, 425 N.Y.S.2d at 181).
 
 
 15
 Similarly, in Feldman v. Allegheny Airlines, Inc., 382 F.Supp. 1271 (D.Conn.1974), aff'd in relevant part, 524 F.2d 384 (2d Cir.1975), even though there was evidence suggesting that some passengers anticipated the plane crash that killed the decedent, the court dismissed the claim for pre-impact conscious pain and suffering, stating:
 
 
 16
 "Nor was any evidence presented from which the Court could fairly infer that the decedent was aware of the proximity of disaster in advance of the actual impact. Mr. Kelly was alert to the situation only because he was monitoring the plane's descent by looking out the window; the plane's attitude underwent no dramatic change indicative of disaster.
 
 
 17
 "Based on the proof adduced specifically on this point and on the totality of the circumstances of this case, the Court concludes that it would be too speculative to award damages for Mrs. Feldman's conscious pain and suffering and contemplation of death." (382 F.Supp. at 1300-01).
 
 
 18
 Eyewitness testimony to the decedent's pain and suffering is not essential to recovery; indeed, in most cases of the present type it would be difficult if not impossible to obtain. But at least some circumstantial evidence must be adduced from which it can reasonably be inferred that the passenger underwent some suffering before the impact. See, e.g., Solomon v. Warren, 540 F.2d 777, 792 (5th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (permissible to infer that four people aboard small Cessna plane were aware of impending death from fact that pilot radioed plans to ditch at sea).
 
 
 19
 In the present case there is no evidence in the record from which a person could reasonably find that Lloyd Shatkin suffered any conscious pain and suffering prior to the impact which instantly killed him. The NTSB report, the reliability of which has not been questioned (indeed it was introduced by the plaintiff), reveals that despite the loss of the left engine the plane on which Shatkin and his wife were passengers took off normally, was able to correct a slight bank to the left, and did not go into its 90-degree left plunge until only 3 seconds before it crashed. There is no evidence permitting an inference that Shatkin was aware that the left engine had been lost on take-off; since he was seated on the right side of the wide-bodied plane, it would be sheer speculation to infer that he knew of the incident. There was no evidence that the pilot or anyone else called the danger to the passengers' attention. As far as the record is concerned Shatkin could have dozed off in his seat. Even if one accepts as wholly credible the testimony of Mrs. Mueller that from a distance of 1 to 2 1/2 miles she saw the plane tilt and roll just before the crash this evidence is wholly insufficient to create an inference that Shatkin knew something was wrong. It is a common experience for a plane in no danger to bank to one side immediately after take off, sometimes sharply, in order to conform to prescribed traffic patterns.
 
 
 20
 On this record we are therefore forced to conclude that even assuming a claim for pre-impact pain and suffering were recognizable in New York, the district court erred in denying defendants' motion for judgment NOV dismissing plaintiff's claim. In view of the insufficiency of the evidence we need not rule upon the issue of whether such a claim, if supported by evidence, would be insufficient on its face. For the same reason we also need not decide whether certain remarks of plaintiff's counsel and the witness Barbara Mueller were so inflammatory as to require a new trial.
 
 The Cross-Appeal
 
 21
 In support of her cross-appeal from the judgment awarding her $15,000 for loss of services and $15,000 for loss of financial support, plaintiff contends that Judge Pollack erred in (1) excluding evidence of her financial needs and the defendant's possible future income, (2) refusing to admit the proffered expert testimony of Dr. Edmund Mantell, and (3) applying a higher burden of proof than that required by New York law. We have reviewed each of these arguments and find them to be without merit.
 
 
 22
 It is elementary that a claim for loss of financial support may be supported by evidence of the plaintiff's needs, and the deceased's probable future income, even though inexact, since such proof by its nature usually cannot be precise. See Jones & Laughlin Steel Corp. v. Pfeifer, --- U.S. ----, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983); Parilis v. Feinstein, 49 N.Y.2d 984, 985-86, 429 N.Y.S.2d 165, 166, 406 N.E.2d 1059, 1060 (1980). The same principle governs admission of evidence regarding services the deceased would probably render to the plaintiff. But the proffered evidence must be relevant to the issues on trial within the meaning of Fed.R.Evid. 401. The trial judge is vested with wide discretion in determining whether an adequate foundation has been laid for admission of the evidence and whether its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury. Fed.R.Evid. 403. See United States v. Corr, 543 F.2d 1042, 1051 (2d Cir.1976); United States v. Catalano, 491 F.2d 268, 273 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974).
 
 
 23
 In the present case the district court excluded evidence of the plaintiff's needs and her son's income not because of inexactness but because of her failure to lay a proper foundation by showing the probability that he would support her and the extent of such likely support. The evidence on that score was limited to several vague assurances made by Lloyd and repeated by his mother at trial, and similar testimony by a friend of the family. Yet it was clear to Judge Pollack that the only support Lloyd had ever given his mother during his lifetime was a monthly annuity of $96.01, which his father had left him, and which was due to expire in 1979. Although Mrs. Shatkin's financial difficulties were said to have begun when she retired from her position as director of health services at Sarah Lawrence College on January 1, 1978, Lloyd gave her no additional money before his death in late May 1979. Moreover, Mrs. Shatkin was only a secondary beneficiary under Lloyd's will, which left everything to his wife. If his wife had lived, Mrs. Shatkin would have received nothing from his estate.
 
 
 24
 There was no evidence that Lloyd had ever made a firm commitment with any reasonable degree of certainty to support his mother. Given this state of the record we cannot say that the district court abused its discretion in refusing to admit evidence regarding Mrs. Shatkin's financial condition and standard of living and testimony of her son's employer about his possible future income. As Judge Pollack stated to plaintiff's counsel "[There] is not a sufficient foundation for what you are attempting to do. You are extrapolating speculations on hypotheses with more speculations at the end. The answer is that you have not laid a foundation for any such evidence."
 
 
 25
 Nor do we find that Judge Pollack erred in excluding the testimony of Dr. Edmund Mantell, plaintiff's economics expert, on the extent of plaintiff's lost support. Here the district court, in ruling on the admissibility of the proposed testimony, possessed not only the power under Fed.R.Evid. 403 to determine whether it had a propensity for misleading or confusing the jury, see United States v. Margiotta, 662 F.2d 131, 142 (2d Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); United States v. Bowe, 360 F.2d 1, 15 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966), but also the discretionary right under Fed.R.Evid. 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony, see Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1313, 1325-26, 1330 (E.D.Pa.1981); 3 J. Weinstein & M. Berger, Weinstein's Evidence p 703 (1982) (the court must find that the data underlying the expert's opinion are "of a kind that is reasonably relied upon by experts in the particular field").
 
 
 26
 The district court noted a number of assumptions and assertions made by Dr. Mantell that were so unrealistic and contradictory as to suggest bad faith. For example, although the only contribution that the decedent had made to his mother was his assignment of the $96.01 monthly annuity due to expire in 1979, Dr. Mantell assumed that Lloyd would have contributed 20% of his disposable income to his mother. That figure was derived from statistics indicating that the average head of a household spends 20% of his income on himself; we find no basis for using that statistic in these calculations, where it has no relevance at all. In a further effort to justify such a high level of projected contributions, Dr. Mantell compared their discounted present value with Mrs. Shatkin's undiscounted projected consumption; such an "apples and oranges" comparison simply cannot withstand scrutiny. Moreover, after projecting Lloyd's income for 1990 to be either $151,990 or $117,700, Dr. Mantell deducted no state tax and applied a constant 11.7% federal tax rate. That assumption is highly suspect even when considered on its own; it is completely unacceptable when one realizes that he used a 23% rate in calculating the tax on Mrs. Shatkin's income from whatever award she might receive, which of course would be far less than Lloyd's annual income. Clearly such proposed testimony was riddled with errors, and therefore excludable under Fed.R.Evid. 703. In addition, it would probably have hopelessly confused and misled the jury because of the latter's inability to appraise the extremely questionable and unsupported assumptions underlying the testimony. We therefore conclude that the trial court's decision to exclude that testimony was not erroneous.
 
 
 27
 Finally, plaintiff claims that it was error for the district court not to charge the jury on New York's "Noseworthy rule," which permits a plaintiff in a wrongful death action to assume a lower burden of proof than in an ordinary negligence action. Noseworthy v. City of New York, 298 N.Y. 76, 80 N.E.2d 744 (1948). We are not persuaded that the Noseworthy rule applies to this case, where the defendants have conceded their liability and the only issue is the proper measure of damages. But even if we assume that it was error not to charge the rule with respect to proof of loss of support and services the error was clearly harmless. There simply was no evidence that the plaintiff would have received any financial support from her son other than the annuity that expired in 1979. Viewed in that light the jury's special verdict of $15,000 was not unreasonable. The $15,000 verdict for the loss of Lloyd's services--which amounted to repairing an iron, changing light bulbs, moving furniture and the like during his occasional visits to Mrs. Shatkin's home--was also quite adequate. In short, applying the Noseworthy rule would have made no difference in this case.
 
 
 28
 The judgment, insofar as it awards $87,500 for pain and suffering, is reversed and the case remanded for entry of judgment notwithstanding the verdict on that issue. In all other respects the judgment is affirmed.
 
 
 
 [1]
 Following New York's choice of law principles, we apply New York law to this case, both because of the numerous contacts with the forum, and because the parties have conducted the entire litigation on the assumption that New York law governs. See Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 405 N.Y.S.2d 441, 376 N.E.2d 914 (1978)